## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KIM K. SUMNER,                        ✦

    *Plaintiff*                        ✦

    v                        ✦          **Civil Action No. CCB-13-539**

MARYLAND JUDICIARY/                        ✦
DISTRICT COURT OF MARYLAND,
    *Defendant*                        ✦

✦    ✦    ✦    ✦    ✦

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Defendant Maryland Judiciary/District Court of Maryland, by its undersigned counsel, moves to dismiss the complaint, or, in the alternative, for summary judgment, and in support of that motion submits this memorandum of law.

## INTRODUCTION

Plaintiff Kim K. Sumner brings this suit alleging "sexual harassment" against the Maryland Judiciary.  Complaint, ECF 1, p. 3.  Specifically, Plaintiff alleges that she was sexually harassed by the Administrative Clerk of the District Court of Maryland for Baltimore City and that the Judiciary "either looked the other way, or when complaints were filed, applied minimal punitive actions against the Administrative Clerk."  Complaint, ECF 1, p. 3.  Plaintiff seeks unspecified damages for "lost time, pain and

mental anguish" in addition to an injunction ordering "Removal of Administrative Clerk."  ECF 1, p. 4.  Because Plaintiff's claims are insufficient, the complaint must be dismissed as a matter of law.

## FACTS

The following facts are not in dispute and are supported by admissible evidence where indicated.  Plaintiff Kim K. Sumner currently is a Human Resources Associate at the Borgerding District Court Building, located at 5800 Wabash Avenue, in Baltimore, Maryland.  On February 24, 2011, Plaintiff filed an internal complaint with the Judiciary's Office of Fair Practices ("OFP"), alleging that the Administrative Clerk of the Baltimore City District Court, Lonnie P. Ferguson, Jr. (the "Respondent") had sexually harassed her, abused his power and retaliated against her. (Exhibit 1).

Specifically, Plaintiff alleged that the Administrative Clerk engaged in vulgar and sexually offensive conduct by requesting that she search the Internet for a particular brand of men's long underwear that he wanted to purchase, and by giving her a large number of burned DVDs of movies, six of which contained inter-racial pornography.   In regard to the abuse of power claim, Plaintiff alleged that the Administrative Clerk spent excessive amounts of time in her office, which intimidated her and made her feel uncomfortable, yet powerless to stop because of his position and authority as Administrative Clerk.  She further maintained that the Administrative Clerk had her order

movies for him on the Internet because he was a movie buff.  Subsequently, Plaintiff alleged that once she discovered the pornographic DVDs and, therefore, asked her immediate supervisor, Lavone Grant ("Ms. Grant"), Deputy Administrative Clerk, to keep the Administrative Clerk out of her office, he became critical of her and her work.

Pursuant to the Judiciary's Policy on Equal Employment Opportunity and Harassment ("Policy") (Exhibit 2), the Acting Manager of the OFP, Larry Jones ("Mr. Jones") interviewed Plaintiff, on February 24, 2011, about the allegations contained in her complaint.   On March 1, 2011, Mr. Jones met with Judge John R. Hargrove, Jr. ("Administrative Judge"), the Baltimore City District Court Administrative Judge, in regard to the complaint.   The Administrative Judge informed Mr. Jones that he was unaware of any problems between Plaintiff and the Administrative Clerk.  After meeting with Mr. Jones, the Administrative Judge made arrangements so that Plaintiff would have no further contact with the Administrative Clerk during the pendency of the OFP investigation.  Accordingly, she was informed, on or about March 7, 2011, that Ms. Grant would serve as her point of contact for all work-related issues.  The Administrative Clerk also was informed of the revised work arrangements and told to have no contact with Plaintiff.

On August 2, 2011, Mr. Jones made a final investigative determination that Plaintiff had been sexually harassed, in violation of the Judiciary's Policy on Equal

Employment Opportunity and Harassment, because the Administrative Clerk gave her six pornographic DVDs and requested that she search the Internet for men's underwear.   Mr. Jones further determined that the Administrative Clerk had intimidated Plaintiff by spending undue amounts of time in her office and having her order movies for him.   Mr. Jones also determined that Plaintiff's request of Ms. Grant to restrict the Administrative Clerk from her office was not handled in accordance with the Policy.   Based on his investigation, Mr. Jones concluded that Plaintiff had not been the subject of retaliatory treatment by the Administrative Clerk.

By letters dated August 2, 2011, Mr. Jones notified Plaintiff and the Administrative Clerk of the outcome of his investigation.  The following day, August 3, 2011, Mr. Jones sent a letter to the Administrative Judge and to the Chief Judge of the District Court, Ben C. Clyburn ("Chief Judge Clyburn"), informing them of his investigative findings and his recommendation that training be provided to the managers and supervisors in the Borgerding District Court Building on their responsibilities under the Judiciary's Policy on Equal Employment Opportunity and Harassment and the Policy on Electronic Communications System Usage, and that they be provided with copies of the policies.   (Exhibit 3).  Thereafter, Mr. Jones spoke with the Administrative Judge and Chief Judge Clyburn about his investigation and recommendations.

**A.      The Judiciary's Response to the Internal Complaint.**

After reviewing the information Mr. Jones provided to them as part of the OFP investigation, the Administrative Judge and Chief Judge Clyburn determined that, effective August 24, 2011, the Administrative Clerk would be suspended, without pay, for 30 days.  (Exhibit 4).[1]

On September 1, 2011, Plaintiff sent Ms. Grant, the Administrative Judge and Ms. Ball a written proposal in which she requested that her office be moved from the Borgerding District Court Building to a new Baltimore City District Court facility, the Shillman Building, located at 500 Calvert Street, which was undergoing renovations. Plaintiff stated that she was requesting the transfer because she did not want to work in the same building with the Administrative Clerk, once he returned from his 30-day suspension.  Upon receipt of the proposal, the Administrative Judge began exploring its feasibility.  In doing so, he learned that the renovations to the Shillman Building were not scheduled for completion until January 2012, at the earliest.

Thereafter, on September 8, 2011, the Administrative Judge and Ms. Grant met with Plaintiff to discuss her proposed move to the Shillman Building.  They explained

---

[1] That same day, the Administrative Judge and the Executive Director of the Judiciary's Human Resources Department, Sharon Sampson Ball ("Ms. Ball"), met with Ms. Grant, at which time she received a Counseling Memorandum regarding her failure to report Plaintiff's complaints about the Administrative Clerk to the proper authority, notwithstanding Plaintiff's request that she not do so.  (Exhibit 5).

that the move could not be accomplished, at that time, because the building would not be available for occupancy until 2012.  With the understanding that Plaintiff wished to have no further contact with the Administrative Clerk, they suggested exploring other interim options.   After additional discussion, Ms. Grant offered Plaintiff the option of moving into her office, which, because of its location, reduced the possibility that Plaintiff would come into contact with the Administrative Clerk, and which would afford her the privacy that her position as Human Resources Associate required.  Initially, Plaintiff accepted the offer and said that she thought it was a good solution.  On September 12, 2011, however, she informed the Administrative Judge and Ms. Grant that she no longer wanted to move into that office because it would be too cramped and small.  She further informed them that she would like to stay in her first floor office and have the Administrative Clerk remain in his second floor office, with staff coming to his office to see him about work-related matters, as had been the arrangement during the OFP investigation.

In response to concerns that Plaintiff expressed to Ms. Grant, the Administrative Judge, Ms. Ball and Mr. Jones about the Administrative Clerk's scheduled return to work on September 26, 2011, the Administrative Judge arranged a meeting with Plaintiff, Ms. Ball and Mr. Jones, on September 20, 2011, to respond to Plaintiff's concerns, review the options that had been explored regarding her office location and discuss the plans for the

Administrative Clerk's return to work.  The matters reviewed and discussed with Plaintiff included:

1. At her request, she would remain in her office in the Borgerding District Court Building.

2. Her proposed move to the Shillman Building was under consideration.  That facility, however, was undergoing renovation and the original plans did not include provisions for the human resources function.  She would be formally notified of the determination regarding her proposal.

3. At her request, the Eastside, Hargrove and Civil District Court facilities would not be considered as relocation options for her.  But that, at any time, she could reconsider making such a move.

4. At her request, Civil Division facility space was found for her office.  Subsequent to finding such space, however, she declined to move to that location.

5. The Administrative Clerk would remain in the Borgerding District Court Building in order to perform his administrative duties, which might require him to come to the first floor of the building to discuss court-related business matters.

6. The Administrative Clerk had been instructed that upon his return to work, he was to have no contact with her at all.  Unintentional conduct, however, might occur, in the normal course of business, during the work day.

7. Ms. Grant, or her designee, would continue to supervise her work and serve as her point of contact with the Administrative Office.

8. There would be periodic monitoring of the revised working arrangements. Pertinent observations would be reported to the Judiciary's Department of Human Resources. At any time, however, if she had any questions or concerns, she should contact Ms. Ball.

On the morning of September 26, 2011, the date of the Administrative Clerk's return to work, the Administrative Judge and Ms. Ball met with the Administrative Clerk. At that meeting, the Administrative Clerk was given a Written Warning. (Exhibit 7). The Administrative Judge and Ms. Ball explained that the Warning set forth the Judiciary's expectations regarding his future conduct. The issues addressed in the Warning included:

1. The Judiciary's zero-tolerance policy of the behaviors that led to Respondent's suspension.

2. Any reoccurrence of such inappropriate behavior or conduct would result in the Administrative Clerk's immediate termination.

3. No retaliatory behavior toward any employee who was the subject of, or participated in, the investigation that led to his suspension for misconduct would

be tolerated.  Any such retaliation on his part, or at his direction, would result in his immediate termination.

4. The Administrative Clerk must limit his interactions with court staff to court-related business.

5. For the duration of his employment with the Judiciary, there would be periodic monitoring of his behavior.  Pertinent observations would be reported to the Judiciary's Department of Human Resources.  Based on that monitoring, the Judiciary reserved the right to take any and all additional steps necessary to ensure that no further inappropriate behavior or conduct occurred.

In addition, the Administrative Clerk was given a copy of the Judiciary's Policy on Equal Employment Opportunity and Harassment.  (Exhibit 2).

**B.     Maryland Commission On Civil Rights Charge Of Discrimination.**

On October 28, 2011, Plaintiff filed a charge with the Commission alleging discrimination based on race and sex.  In her charge, she alleges that after receiving no help from Ms. Grant when the Administrative Clerk sexually harassed her, she filed a complaint with Mr. Jones on February 25, 2011.   She further alleges that she notified Mr. Jones, in March 2011, that the Administrative Clerk continued to have contact with her despite the filing of her complaint.

9

Plaintiff's charge states that during the Administrative Clerk's suspension, she requested a transfer to another court location because she believed that, upon the Administrative Clerk's return to work, the work environment would become hostile and she would risk being subject to retaliation. She alleges that the Judiciary offered her transfer options, but they were "less desirable work locations."

According to Plaintiff, as a result of the Administrative Clerk's return to work, she feels that she is working in a hostile environment because running into him during the course of the day is always a possibility. She states that she makes every effort to avoid him because she feels threatened, and she has reported her concerns to management "to no avail." She alleges that her fear is warranted because the Administrative Clerk has a history of unprofessional behavior and has been previously suspended for such conduct.

Plaintiff did report her allegations to Mr. Jones, on February 24, 2011, that the Administrative Clerk had engaged, inter alia, in sexually inappropriate conduct. Mr. Jones immediately began an investigation. (Exhibit 1). After learning of the allegations, on March 1, 2011, the Administrative Judge made arrangements so that Plaintiff would have no further contact with the Administrative Clerk during the pendency of the OFP investigation. On August 2, 2011, Mr. Jones determined that Plaintiff had been sexually harassed and intimidated, in violation of the Judiciary's Policy on Equal Employment Opportunity and Harassment. (Exhibit 2). He further determined that Plaintiff's request,

after discovering the pornographic DVDs the Administrative Clerk had given her, that Ms. Grant restrict the Administrative Clerk from coming into her office, was not handled in accordance with the Policy. Consequently, after being informed by Mr. Jones of the Administrative Clerk's misconduct, and after considering all relevant information, including his prior suspension, the Administrative Judge and Chief Judge Clyburn suspended the Administrative Clerk, without pay, for 30 days. (Exhibit 4). In addition, because of Ms. Grant's failure to report Plaintiff's concerns about the Administrative Clerk to the appropriate authority, even though Plaintiff had asked her not to do so, she received a counseling memorandum. (Exhibit 5).

Plaintiff did submit a request, on September 1, 2011, to relocate her office to the Shillman Building, prior to the Administrative Clerk's September 26, 2011 return to work. After looking into the matter, the Administrative Judge informed her that the Building was undergoing renovations, which were not scheduled for completion until 2012. Therefore, no decision could be made regarding her proposal at that time. The Administrative Judge and Ms. Grant, however, took that opportunity to engage in an interactive dialogue with Plaintiff about other possible locations for her office, either in the Borgerding District Court Building or elsewhere. Based on that dialogue, the Administrative Judge pursued every option that Plaintiff agreed to, suggested or expressed interest in. Ultimately, however, Plaintiff rejected all of the available options.

Nevertheless, she was informed both orally and in writing, that she could reconsider these options at any time.   (Exhibit 6).   A great deal of time and effort was thus spent attempting to accommodate her request to relocate her office.   Accordingly, there is no evidence to support Plaintiff's belief that she was discriminated against on the basis of race, or in any way retaliated against for filing a complaint with the OFP.

On September 20, 2011, the Administrative Judge, Ms. Ball and Mr. Jones met with Plaintiff to discuss the Administrative Clerk's return to work.   At that time, she was informed, among other things, that because she had chosen to remain in her office in the Borgerding District Court Building, the Administrative Clerk had been instructed to have no contact with her at all, that Ms. Grant would continue to supervise her work and that there would be periodic monitoring of the revised work arrangements.   She was also informed that she could contact Ms. Ball, at any time, with questions or concerns. Thereafter, upon his return to work, the Administrative Clerk was informed verbally and in writing, in a meeting with the Administrative Judge and Ms. Ball, inter alia, that the recurrence of any of the inappropriate behavior that led to his suspension would result in immediate termination.   He was also informed that no retaliatory behavior toward Plaintiff, or anyone who was a part of the investigation, would be tolerated, and that his behavior would be monitored.  (Exhibit 7).

In the course of his ongoing administrative oversight and monitoring of the revised work arrangements involving Plaintiff and the Administrative Clerk, the Administrative Judge learned that, upon his return to work, on September 26, 2011, the Administrative Clerk restricted himself to the second floor of the Borgerding District Court Building, so as to prevent any possibility of contact with Plaintiff.   In addition, after the Administrative Clerk's return, Plaintiff did not inform the Administrative Judge of any problems; nor did she contact Ms. Ball, who had told Plaintiff to contact her at any time to report any problems.   Indeed, Ms. Ball tried, without success, to arrange a meeting with her and Ms. Grant to follow up on the September 20, 2011 meeting.   Consequently, Ms. Ball sent Plaintiff a letter, which reaffirmed her willingness to meet with her. (Exhibit 6).   Ms. Ball did not hear from Plaintiff until January 25, 2012, at which time she received a letter referencing Ms. Ball's earlier letter, and the fact that she told her to contact her with any questions or concerns.   (Exhibit 8).   Thereafter, by letter dated February 3, 2012, Ms. Ball addressed the Human Resources issues that Plaintiff raised and referred the remaining issues to the OFP for follow up.   (Exhibit 9).

Thus, Plaintiff's allegation that she reached out to management with her concerns "to no avail" is not supported by the evidence, nor are her claims that she has been subjected to ongoing sexual harassment and a hostile work environment.   Indeed, upon receiving Plaintiff's OFP complaint, on February 24, 2011, the Judiciary promptly began

an investigation and, at the conclusion of that investigation, took corrective action to prevent any further misconduct and to ensure compliance with its Policy on Equal Employment Opportunity and Harassment (Exhibit 2), all other applicable policies, and the law.

Plaintiff's complaint with the Maryland Commission on Civil Rights was filed on October 28, 2011, (Exhibit 10), and later amended on February 14, 2012.  (Exhibit 11).  The charges were investigated by the Commission and written findings were prepared in which the Commission found no probable cause to believe that the Judiciary had discriminated against the Plaintiff.   (Exhibit 12).   On December 3, 2012, the EEOC issued Plaintiff a right to sue letter.  (Exhibit 13).  Plaintiff filed suit February 20, 2013.

## ARGUMENT

### I.  STANDARD OF REVIEW

Defendant moves to dismiss pursuant to Rule 12(b)(6), or, in the alternative, for summary judgment. "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts

and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

Where matters outside the pleadings are considered by the court, a defendant's motion to dismiss will be treated as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). Federal Rule of Civil

Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

16

## II. PLAINTIFF HAS FAILED TO STATE A CLAIM FOR SEXUAL HARASSMENT.

In order to establish a sexual harassment claim, a plaintiff must show that the harassment was "(1) unwelcome; (2) based on [a protected classification]; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and [(4)] must also show "'that there is some basis for imposing liability' for the harassment on the employer." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011) (*quoting Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001)).

In *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008), the Fourth Circuit elucidated the "severe or pervasive" prong:

> The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (citing *Harris [v. Forklift Sys., Inc.]*, 510 U.S. [17,] 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 [(1993)]. First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21-22. Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiffs position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). . . .
>
> This objective inquiry "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. Rather, when determining whether the harassing conduct was objectively "severe or pervasive," we must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23; *Ocheltree*, 335 F.3d at 333.

"[N]o single factor is" dispositive, *Harris*, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81-82.

While this standard surely prohibits an employment atmosphere that is "permeated with discriminatory intimidation, ridicule, and insult," *Harris*, 510 U.S. at 21 (internal quotations omitted), it is equally clear that Title VII does not establish a "general civility code for the American workplace," *Oncale*, 523 U.S. at 80. This is because, in order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Indeed, as the Court observed, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations and citations omitted); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001).

Plaintiff alleges here that in 2010, the Administrative Clerk harassed her by (1) giving her "defaming and degrading pornography by dvds"; (2) asking her to look up men's underwear sites; and (3) subjecting her vulgar and degrading terminology regarding women in general. She further alleges that after she filed an internal complaint, "the outcome was a 30 day suspension" for the Administrative Clerk. She does not allege that any of these actions continued after she complained of them or that the incidents were anything more than isolated incidents of boorish behavior. Therefore, Plaintiff's allegations fail to satisfy the third prong of *Xerxes*.

Even assuming, *arguendo*, that Plaintiff has met the first three prongs of *Xerxes*,

her allegations cannot show that there is some basis for imposing liability' for the harassment on the employer. In *Faragher v. City of Boca Raton*, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998), the Supreme Court articulated the following standard by which federal courts must assess the vicarious liability of employers for a hostile environment created by a supervisor:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reason able care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 807 (citation omitted); *Ellerth*, 524 U.S. at 765 (citation omitted). In other words, "[o]nce the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *EEOC v. Xerxes Corp.*, 639 F.3d at 669-670 (quoting *EEOC v. Sunbelt Rentals, Inc*., 521 F.3d 306, 319 (4th Cir. 2008)

"The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." *Spriggs*, 242 F.3d at 187 (internal quotation marks omitted). "However, the mere promulgation of an anti-harassment

policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably." *Id*. (internal quotation marks omitted); *see also Sunbelt*, 521 F.3d at 320 ("While the adoption of an effective anti-harassment policy is an important factor in determining whether [an employer] exercised reasonable care, the policy must be effective in order to have meaningful value." (internal quotation marks omitted)).

Here, it cannot be disputed that the Judiciary's anti-harassment policies, the Policy on Equal Employment Opportunity and Harassment, (Exhibit 2), "provide[d] reasonable procedures for victims to register complaints." *Xerxes*, 639 F.3d at 669-670. Thus, for purposes of the fourth element, this Court need only examine whether the Judiciary's responses to the complaint made under its policies were reasonably calculated to end the harassment and, therefore, that liability for the harassment may not be imputed to the Judiciary. *Id*.

As the Fourth Circuit has made plain, there is no "exhaustive list" or "particular combination" of remedial measures or steps that an employer need employ to insulate itself from liability. *Id*. Among other things, the Court has considered "the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.*

"A remedial action that effectively stops the harassment will be deemed adequate as a matter of law. On the other hand, it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . as a matter of law." *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3d Cir. 1997).

> In such cases, [courts] consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment. . . . By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.

*Xerxes*, 639 F.3d at 669-670.

Even in cases of repeat violations, an employer is not liable, although harassment persists, "so long as each response was reasonable. It follows that an employer is not required to terminate a [particular] perpetrator except where termination is the *only* response that would be reasonably calculated to end the harassment." *Xerxes*, 639 F.3d at 670 (internal citations omitted)(emphasis added).

Plaintiff alleges here that after she filed an internal complaint, "the outcome was a 30 day suspension" for the Administrative Clerk.  The suspension was followed by a written warning outlining the Judiciary's expectations for appropriate workplace behavior

in the future and warning of dire and increasingly severe consequences for repeated incidents.  Tellingly, Plaintiff does not allege in her complaint that harassment continued after the suspension and warning letter.  At most, Plaintiff alleges that while she is still working with the Administrative Clerk and his management team, she considers "[her]self in an isolated hostile environment."  Such allegations are insufficient as a matter of law to impute liability to her employer, the Judiciary.

In sum, Plaintiff has alleged that she was harassed, that she complained in accordance with the established policies of the Judiciary to make such complaints, that severe discipline was imposed as a result of her complaint, and that no further harassment occurred after the discipline.  The Judiciary took adequate and appropriate steps to curb the boorish harassment.

**WHEREFORE**, Defendant respectfully requests that this Court **GRANT** this motion and dismiss this case with prejudice or enter judgment in its favor as a matter of law.

Respectfully submitted,


Douglas F. Gansler
Attorney General of Maryland

and

H. Scott Curtis
Assistant Attorney General
Federal Bar No. 08313
200 St. Paul Place
20th Floor
Baltimore, Maryland 21202
(410) 576-6576
(410) 576-6393 (fax)
hcurtis@oag.state.md.us

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this July 18, 2013, a copy of the foregoing was served by electronic means via the Court's Case Management / Electronic Case Files (CM/ECF) system on the persons entitled to receive such notice, and by US Mail, postage prepaid to:

Kim K. Sumner
153 1/2 W. Main St, Apt 1
Westminster, MD 21157

H. Scott Curtis
Assistant Attorney General

23